**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:19-cr-00220-JDL |
| TERREL WALKER, | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

NOW COMES the Defendant, Terrel Walker, by and through his attorney, Leonard I. Sharon, Esq., and moves this Honorable Court as follows:

**FACTS**

This investigation began on August 15, 2019, at 9:00 p.m., on Interstate-95 Northbound in York, Maine, when Trooper John Darcy of the Maine State Police began pursuing Mr. Walker's vehicle. Trooper Darcy is on dashcam video explaining that the reason for pursuit was because he got a look at the driver of the vehicle (a black male), who "looks like a thug" because he was "wearing a wifebeater" and "has dreads" and therefore seemed like he could "be involved in drug dealing or gangs or something." "The guy (Mr. Walker) looks like a thug, to be honest with you." Trooper Darcy pulls over "thugs." After approximately three miles of pursuit, Trooper Darcy initiated a traffic stop on Mr. Walker's vehicle around mile-marker ten on I-95 Northbound. Trooper Darcy alleges that the Defendant was driving in the middle lane whilst failing to pass or overtake any other vehicles in violation of Title 29-A Section 2052(6). In the midst of Trooper

1

Darcy's investigation of this alleged violation, a drug dog arrived on scene and allegedly alerted

on the vehicle.  A search ensued, resulting in the location and seizure of contraband.

## **ARGUMENT**

I.   THE TRAFFIC STOP EXECUTED BY TROOPER JOHN DARCY WAS NOT A VALID STOP SUPPORTED BY ARTICULABLE SUSPICION.

   i.   Defendant Has Standing To Challenge The Stop

Fourth Amendment rights are personal rights, and as such, "the first inquiry in examining

a Fourth Amendment claim is whether the defendant had a legitimate expectation of privacy in the

area searched or the item seized."  *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1990).

Standing in this context is really a short-hand for whether the defendant had a reasonable

expectation of privacy in the car.  *See id.* at 113 n.1.  In determining this issue, the question is not

whether an individual chooses to conceal "private activity," but instead "whether the government's

intrusion infringes upon the personal and societal values protected by the Fourth Amendment."

*California v. Ciraolo*, 476 U.S. 207, 212 (1986).  The courts often look to factors such as

ownership, possession, and/or control; historical use of the property searched or thing seized;

ability to regulate access; the totality of the surrounding circumstances; the existence or

nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an

expectancy under the facts of a given case.  *Sanchez*, 943 F.2d at 113.  Generally speaking, persons

who borrow cars have standing to challenge searches of the borrowed vehicles.  *United States v.*

*Sugar*, 322 F. Supp. 2d 85 (D. Mass. 2004).  *See also Byrd v. United States*, 138 S. Ct. 1518, 1531

(2018) ("[T]he Court now holds, that the mere fact that a driver in lawful possession or control of

2

a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy.").

Because Mr. Walker had an expectation of privacy in the car, he therefore has standing to challenge the stop and search of the vehicle.  While Mr. Walker is not the owner of the car, he did borrow the car with full permission from the renter.

> ii.   There Is Insufficient Credible Evidence To Conclude That Trooper Darcy Had Reasonable Articulable Suspicion to Stop Terrel Walker

An officer must have "reasonable articulable suspicion that criminal activity is afoot before he can lawfully conduct an investigatory stop." *United States v. McKoy*, 428 F.3d 38, 39 (1st Cir. 2005).  "A traffic stop based on a traffic infraction, 'must have been supported by a reasonable suspicion that a traffic violation occurred.'" *United States v. Mercer*, No. 2:13-CR-176-GZS 2014 WL 2216999, at *7 (D. Me. May 29, 2014) (quoting *Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012)), *aff'd*, 834 F.3d 39 (1st Cir. 2016).  "In evaluating whether reasonable suspicion existed, [the court] 'look[s] at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

This Court has routinely upheld the validity of pretextual stops, as long as the stop was predicated on the requisite articulable suspicion, *Mercer*, No. 2:13-CR-176-GZS, at *6 (citing *United States v. McGregor,* 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else.")), but "the court must consider whether the officer's action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the

interference in the first place." *United States v. Stanley*, 915 F.2d 54, 55 (1st Cir. 1990) (citing *United States v. Sharpe*, 470 U.S. 675, 682 (1985)); *United States v. Orth*, 873 F.3d 349, 354 (1st Cir. 2017) ("An officer's actions must be justified at their inception . . . .").

Mr. Walker contends that the Government will be unable to meet its burden of proving that the Defendant operated in violation of Title 29-A M.R.S.A. § 2052(6) and thus, Trooper Darcy did not have reasonable articulable suspicion to conduct the traffic stop.   Title 29-A M.R.S.A. § 2052(6) requires that "an operator driving on a limited-access way with a speed limit of 65 or more miles per hour is restricted in ordinary operation to the right-hand lane and may use adjacent lanes for overtaking and passing another vehicle, but must return to the right-hand lane at the earliest opportunity."  Me. Rev. Stat. tit. 29-A, § 2052.  The Defendant contends that the United States' evidence will fail to show he was in violation of Title 29-A M.R.S.A. § 2052(6) under the language of that statute on August 15, 2019.  As such, Trooper Darcy did not have reasonable articulable suspicion to stop the Defendant.  The traffic stop was purely pretextual, and because it was void of in any reasonable articulable suspicion, was in violation of Mr. Walker's Fourth Amendment rights.

It is a basic proposition that in determining whether a party has met its burden of proof, the credibility of each witness is gauged.  Maine's Law Court provided a useful reminder in assessing a police officer's credibility in instances where the officer's bias is evident.  They stated:

> evidence of an officer's subjective motivation for a stop, seizure, or search may well be relevant on matters of credibility, observer bias, or context.  Thus, the relevance of alleged pretext or subjective motivation, because it may bear on credibility of witnesses, context, or reliability of the evidence presented, will be determined on a case-by-case basis."

*State v. Sasso*, 2016 ME 95, at ¶ 16, 143 A.3d 124, at 129.

Trooper Darcy's bias against Defendant's race and appearance render his alleged suspicion unreasonable.  Trooper Darcy claimed to have stopped Mr. Walker for violation of 29-A M.R.S. § 2052, which restricts drivers on divided highways to "ordinary operation to the right-hand lane and may use adjacent lanes for overtaking and passing another vehicle, but must return to the right-hand lane at the earliest opportunity."  29-A M.R.S.A. §2052(6).

This statute contains terms which are subject to the subjective interpretation of law enforcement, "the earliest opportunity."  *Id.*  Trooper Darcy claims to have been enforcing this statute as grounds to pull over Mr. Walker, but in reality, Trooper Darcy's suspicion was formed at the York toll plaza when he visually observed what Mr. Walker was wearing and his hairstyle, and decided that these particular markers on a black man meant that Mr. Walker was a "thug."

It was this determination, that Mr. Walker was "thug," that actually formed the reason for Trooper Darcy's traffic stop of Mr. Walker's vehicle.  Reasonable suspicion cannot be based on a Defendant's "suspicious looks."  *Brown v. Texas*, 443 U.S. 47 (1979).  Indeed, Trooper Darcy needed an objective basis to stop Mr. Walker.  *United States v. Cortez*, 449 U.S. 411 (1981).

Trooper Darcy points to Mr. Walker's alleged failure to "return to the right-hand lane at the earliest opportunity" as the objectively reasonable basis for the stop.  However, such a determination is both highly fact intensive and subject to subjective opinion and interpretation. Given that Trooper Darcy clearly held a bias against Mr. Walker, his subjective analysis of the timing of Mr. Walker's return to the right-hand lane suffers from the unmistakable taint of that bias.  Trooper Darcy was unable to make an objectively reasonable determination regarding Mr. Walker's compliance with 29-A M.R.S.A. §2052 (6), therefore this traffic stop was not supported by reasonable articulable suspicion required by *Terry v. Ohio*, and the Fourth Amendment of the U.S. Constitution.  392 U.S. 1 (1968).

II.     IF THE COURT SHOULD CONCLUDE THAT THIS IS A PRETEXTUAL STOP BUT SUPPORTED BY ARTICULABLE SUSPICION, THE SEIZURE OF EVIDENCE RESULTING FROM PRETEXTUAL RACE AND CLASS BASED SEIZURES SHOULD BE BARRED AS UNREASONABLE – THE COST OF *WHREN* HAS BEEN EXCESSIVE.

i)      Pretextual Stops Since 1996 Have Been Held Reasonable Under the Fourth Amendment.

In 1996, the United States Supreme Court held in *Whren v. United States,* 517 U.S. 806 (1996), that pretextual traffic stops do not violate the Fourth Amendment as long as police officers identify an objectively reasonable suspicion to pull the vehicle over. *See, e.g.*, *United States v. Turner,* No. 2:18-CR-00176-JDL, 2019 U.S. Dist. LEXIS 111162 (D. Me. July 3, 2019) (Levy, J.). In that case Your Honor wrote that there was evidence that supported the defendant's contention that the trooper had formulated the intent to stop the defendant's vehicle before he had even noticed the occupant's alleged suspicious behavior, thereby making the stop pretextual.

Your Honor concluded that "[N]onetheless, '[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else.'" *Id.* at *9 (citing *United States v. McGregor,* 650 F.3d 813, 820 (1st Cir. 2011)).

The Court in *Turner* defined and applied *Whren* to a traffic stop which the Court concluded very well could have been pretextual.

Pretextual stops must come to an end. The price our society continues to pay for this legal fiction is too great a price to pay.

ii)     Pretext Stops and Race

With only a few exceptions, the Supreme Court has seized every opportunity to facilitate the drug war primarily by eviscerating Fourth Amendment protections against unreasonable

6

searches and seizures by the police.  The rollback has been so pronounced that some commentators charge that a virtual "drug exception" now exists to the Bill of Rights.  Shortly before his death, Justice Thurgood Marshall felt compelled to remind his colleagues that there is, in fact, "no drug exception" written into the text of the Constitution.  Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness,* 61 (2012).  Professor Alexander's landmark book has been widely hailed as a well-researched and well-written indictment of the damage to our rights of privacy suffered by the war on drugs

The dual wars on terror and drugs have disproportionately affected persons of color.  Crack and African-Americans were linked at the hip.  A Muslim-sounding name in and of itself can bring heightened suspicions.  Subjective racism allows a human being to permit ill-conceived notions about a certain class of people to raise unfounded suspicions.  Ill-conceived fears might cause otherwise innocuous behavior to appear suspicious.  Officers know, full well, that courts are reluctant to second-guess the officer on the road who must make these split-second decisions. After all, the suspicion need only be articulable.  Once subjective racism comes to play in law enforcement, the brunt of law enforcement intrusions will necessarily be effectuated upon persons of color.  In her book, Professor Michelle Alexander found that:

> In Volusia County, Florida, a reporter obtained 148 hours of video footage documenting more than 1,000 highway stops conducted by state troopers.  Only 5 percent of the drivers on the road were African American or Latino, but more than 80 percent of the people stopped were minorities.

> In Illinois, the state police initiated a drug interdiction program known as Operation Valkyrie that targeted Latino motorists.  While Latinos comprised less than 8 percent of the Illinois population and took fewer than 3 percent of the personal vehicle trips in Illinois, they comprised approximately 30 percent of the motorists stopped by drug interdiction officers for discretionary offenses, such as

failure to signal a lane change.  Latinos however, were significantly less likely than whites to have illegal contraband in their vehicles.

A racial profiling study in Oakland, California, in 2001 showed that African Americans were approximately twice as likely as whites to be stopped, and three times as likely to be searched.  Alexander, *supra* at 134 (internal citations omitted).

Professor Alexander concluded  that persons of color suffer these warrantless intrusions at a greater rate because of the heightened suspicion of drug activity.  Here, Mr. Walker became a suspect due to his dreadlocks and sleeveless T-shirt.  What made Professor Alexander's work so compelling is that it clearly tied policing to racial bias and dubbed these drug stops as the New Jim Crow Laws.

While it is true that our courts are just now debating whether to permit the government to have warrantless access to certain novel areas, it has long been the law that one's expectation of privacy is necessarily constricted in an automobile.  Mobility and heavy government regulation of motor vehicles allow for this decreased expectation of privacy.  *State v. Sylvain,* 2003 ME 5 ¶ 10, 814 A.2d 984, 987.

Probable cause is not needed to pull someone over as they drive. *Turner,* No. 2:18-CR-00176-JDL at *3.  The very low standard of articulable suspicion will allow such an intrusion.  *Id.*  The police are not even required to suspect a violation of a law or traffic regulation.  Public safety concerns alone permit a warrantless stop of an automobile.  *Id.*  The police officer need not observe one iota of suspicious behavior.  *Id.* The officer need only observe a vehicle in relative proximity to where an anonymous caller to dispatch reported erratic driving by a vehicle matching the description of the one in the officer's sights.  *Id.*

There was a time when courts would not tolerate pretext stops.  There was a time when courts wanted the officers to have a clean heart and mind when enforcing constitutional

8

protections.  Courts would ask whether the officer would have normally stopped the vehicle rather than whether the officer could in fact pull the vehicle over.  A partially covered license plate seen after a snow storm might not usually cause a particular officer to initiate a stop.  Perhaps even the officer may have had longstanding orders not to stop folks under such conditions.  However, other unspoken suspicions might cause this seldom used ordinance to now justify a legal stop.  It is no longer whether the officer would normally stop a vehicle.  The courts only require that he could.  "Could" rather than "would" is the new barometer to measure governmental intrusions on the highway.  *Wren,* 517 U.S. at 813 (subjective intentions play no role in ordinary probable cause Fourth Amendment analysis).  To top it all off, even if the officer is mistaken as to the existence of a statute or ordinance that justifies the stop of a particular vehicle, the stop will be allowed.  *Heien v. North Carolina,* 574 U.S. 54 (2014).  In other words, if there is no such ordinance involving a violation for a partially covered plate, the good faith belief that one exists will suffice.  *Id.*  (As long as the mistake is reasonable, the stop will pass constitutional muster).

When you think about it, it is almost a wonder that a motorist can get from Point A to Point B without being pulled over.[1]

It is too easy for the court to accept at face value the stated pretext.

iii)    <u>*Wren* and Racial Profiling</u>

It was quickly realized that the brunt of pretextual stops would fall upon persons of color.

> The *Wren* Court left African Americans and Latinos without an effective remedy for discriminatory pretextual traffic stops when it suggested the Equal Protection Clause as the appropriate constitutional basis for challenging these stops.

---

[1] "If an officer follows any motorist long enough, they will eventually violate <u>some</u> traffic law, making any citizen fair game for a traffic stop almost anytime, anywhere, virtually at the whim of police,"  Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. _____, 4 n.8 (forthcoming 2021), at 3–4, n.6.

Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. ____, 4 n.8 (forthcoming 2021) (citing Angela J. Davis, *Race, Cops, and Traffic Stops,* 51 U. Miami L. Rev. 425, 427 (1997)).

iv)   Damage Caused by Racial Profiling and *Whren*

Time has passed since these authors predicted that *Whren* would lead to racial profiling. Enough time has passed that statistics can now be used to determine the price people of color have paid after *Whren.*

A recent note in the Boston College Law Review written by Melissa Whitney, *The Statistical Evidence of Racial Profiling in Traffic Stops and Searches: Rethinking the Use of Statistics to Prove Discriminatory Intent,* 49 B.C.L. Rev. 263 (2008), is helpful.   The Note concludes that "strong statistical association between a driver's race and frequency of stops/searches from well-planned statistical studies support an inference of discriminatory intent." *Id.* at 299.

This Court *in dicta* in Order on Motion for Discovery, *United States v. Jones,* No. 2:19-CR-00201-JDL, 2020 WL 3128905 (D. Me. June 12, 2020), recognizes that statistics might indeed provide circumstantial proof of racial animus in a certain stop.   The point being that there exists statistical platforms that can prove helpful in making these decisions.

The communities of color already know what statistics prove.   That is, that when given this type of unfettered discretion, police officers will use it in a way that disproportionately targets motorists of color.   *See* Rushin & Edwards, *An Empirical Assessment, supra* at 4.   See also: Maclin, Tracey, *Race and The Fourth Amendment,* 51 Vand. L. Rev. 333, 342-344 (1998).   (This article presents evidence of the links between pretextual stops and racial bias.)

Tracey Maclin wrote *Race and The Fourth Amendment* twenty-two years ago, and strongly predicted that racial profiling would inevitably result from *Whren.*  The author, along with Maria Savarese revisited the topic in *Martin Luther King, Jr. and Pretext Stops (and Arrests):  Reflections on How Far We Have Not Come Fifty Years Later,* 49 U. of Mem. L. Rev. 101 (2018).  The authors note that:

> The investigatory stop is why blacks are stopped at a much higher rate than whites and why police pursue intrusive lines of questioning and searches more commonly among stops of blacks than whites . . . This racial difference in police practices and people's lived experience and shared knowledge of these practices is why black people commonly rate stops that they have experienced as unfair, while whites are generally more sanguine about stops that they have experienced.  It is a key reason why, compared to whites, African-Americans so distrust police.

*Id.* at 49 (citations omitted).

We have heard and read and seen much lately about the relationship of communities of color to police departments throughout our country.  A constant thread that binds the demonstrators and the complaints is the distrust communities of color have toward police departments.  "While traffic stop interactions with the police may be shrugged off as brief inconveniences for whites, for black Americans, they can lead to humiliation, violence, and even death."  Tanvi Misra, *Is It Time to Reconsider Traffic Stops?,* Bloomberg CityLab (June 6, 2018, 1:29 PM), *https://www.bloomberg.com/news/articles/2018-06-06/are-traffic-stops-a-pretext-for-racial-profiling*.  In *"Creating A New Era of Public Safety,"* the Leadership Conference Education Fund calls for the elimination of discriminatory and bias-based stops by curtailing pretextual stops.  Leadership Conference Education Fund, *Creating a New Era of Public Safety*, https://civilrights.org//edfund/creating-a-new-era-of-public-safety.  These are to name a few.

The harm that devolved from these pretextual stops goes far beyond the stops themselves.  There is but little question that confidence in police departments' treatment of people of color is

at an all-time low.  Once a part of society loses faith that the police serve and protect us equally, we lose the foundations of our democracy.

A recent Case Western Law Review article speaks to this insidious result of pretextual stops, i.e., the undermining of police legitimacy.  *See* Jonathan Blanks, *Thin Blue Lies:  How Pretextual Stops Undermine Police Legitimacy,* 66 Case Western L. Rev. 931 (2016).  This is a fascinating article that can safely be said predated the roiling mistrust that people of color are now expressing on the streets of our country.  The author cogently argues that:

> "[P]retextual stops are one part of a larger and deeply troubling mélange of legal fictions, intentional deception of the innocent, and perverse incentives that undermine the perceptions of legitimacy of law enforcement, particularly for black Americans.  As a partial remedy to the larger problem of police legitimacy in black communities, I contend the use of pretextual stops ought to be severely curtailed or eliminated outright to improve police relationships with African-Americans."

*Id.* at 931–32.

### III.   CONCLUSION

The stop of the Defendant offends the Fourth Amendment mandate that stops of citizens be reasonable.  The stop here offends the United States Constitution.

### IV.   TERREL WALKER INTENDS TO CHALLENGE THE RELIABILITY OF THE K-9 AND THEREFORE CONTEST WHETHER THE DOG PROPERLY ALERTED.

"A police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present.  *Florida v. Harris*, 568 U.S. 237, 243–44 (2013) (citations omitted).

While "a reliable canine sniff outside a vehicle can provide probable cause to search the vehicle," *United States v. Brown*, 500 F.3d 48, 57 (1st Cir. 2007), "[t]he existence of probable cause based on an alert by a drug dog depends upon the dog's reliability," *United States v.*

*Owens,* 167 F.3d 739, 749 (1st Cir. 1999).   Additionally, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause -- if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions."   *Harris,* 568 U.S. at  247.   In evaluating a dog's reliability, the Supreme Court instructs a court to weigh the competing evidence.  *Id.* at 248.  Ultimately, "[t]he question -- similar to every inquiry into probable cause -- is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would    reveal    contraband    or    evidence    of    a    crime."   *Id.   See   also United States v. Martin*, No. 2:18-CR-00124-JDL, 2019 WL 2396550 (D. Me. June 6, 2019).

The Defendant will request that this Honorable Court examine the totality of the circumstances to determine if probable cause existed for the search.

V.    CONCLUSION

This stop by Trooper Darcy based upon his classification of citizens by race, hairstyle, and dress offends our notions of fair, even-handed law enforcement.

The Fourth Amendment, albeit shrunken in its breadth, still should protect citizens from the type of stop effectuated here.

Dated at Lewiston, Maine, this 1st day of July, 2020.

/s/Leonard I. Sharon
Leonard I. Sharon, Esq.
ME Bar No. 3291
Attorney for Defendant, Terrel Walker
Andrucki & King
179 Lisbon Street, 3rd Floor
P.O. Box 7120
Lewiston, ME 04243-7120
(207) 777-4600
*LIS@andruckilaw.com*

13

/s/ Logan E. Perkins
Logan E. Perkins, Esq.
ME Bar No. 5033
Co-counsel for Defendant, Terrel Walker
Perkins Law Office
253 Waldo Ave.
Belfast, ME 04915
(207) 949-7371
*logan@belfastcriminallaw.com*

CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Defendant's Motion to Suppress Evidence with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Meghan E. Connelly, AUSA
United States Attorney's Office
100 Middle Street, East Tower, 6th Fl.
Portland, ME 04101
*meghan.connelly@usdoj.gov*

I hereby certify that on July 1, 2020, I have mailed by United States Postal Service, the document to the following non-registered participant at the following address:

Terrel Walker
P.O. Box 372
Orono, ME 04473


Dated at Lewiston, Maine, this 1st day of July, 2020.

/s/Leonard I. Sharon
Leonard I. Sharon, Esq.
Attorney for Defendant, Terrel Walker
Andrucki & King
179 Lisbon Street, 3rd Floor
P.O. Box 7120
Lewiston, ME 04243-7120
(207) 777-4600
*LIS@andruckilaw.com*

15